Filed 9/23/14  Tradewind Consulting v. Wildcat Distributors CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TRADEWIND CONSULTING, LLC, et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>WILDCAT DISTRIBUTORS, INC., et al.,<br><br>Defendants and Respondents. | B250835<br><br>(Los Angeles County Super. Ct. No. BC458005, consolidated with BC462741) |

APPEAL from a judgment of the Superior Court for Los Angeles County, Barbara M. Scheper, Judge.  Affirmed in part, reversed in part and remanded.

Segal Skigen, Andrew D. Shupe and Lawrence Segal for Plaintiffs and Appellants.

Manfredi, Levine, Eccles, Miller & Lanson, Stuart E. Cohen and Don E. Lanson for Defendants and Respondents Wildcat Distributors, Inc. and Wildcat Asset Management.

The Dressler Law Group and Thomas W. Dressler for Defendant and Respondent Mindey Morrison.

Law Office of Jeanne Collachia and Jeanne Collachia for Defendant and Respondent Steven Goverman.

This case involves disputes among family members regarding a business and real property they inherited. Plaintiff Michael Morrison and a company he is associated with, plaintiff Tradewind Consulting, LLC (Tradewind), filed a direct action and a derivative action against his sister, Mindey Morrison, and his nephew, Steven Goverman,[1] as well as the business, Wildcat Distributors, Inc. (WDI), and the company that holds the inherited real property, Wildcat Asset Management, LLC (WAM).[2] The direct and derivative actions were consolidated. Following a bench trial on the consolidated actions, the trial court issued a statement of decision in which it found that plaintiffs had not carried their burden of proof as to some causes of action and lacked standing as to other causes of action. The court declined to rule on the merits of the remaining causes of action, having concluded that plaintiffs came to the court with unclean hands, and entered judgment in favor of defendants on both of plaintiffs' complaints.

On plaintiffs' appeal from the judgment, we find the record supports the trial court's rulings on the causes of action it decided on the merits or on standing grounds, and affirm the judgment as to those causes of action. However, we conclude the doctrine of unclean hands does not apply under the circumstances of this case. Accordingly, we reverse the judgment as to those causes of action and remand with directions to the trial court to decide those claims on the merits based upon the record of the trial.

---

[1] We will refer to the members of the family by their first names to avoid confusion.

[2] Steven also filed a cross-complaint against Michael, Mindey, and Tradewind. Because no appeal was taken from the judgment on the cross-complaint, our discussion of the cross-complaint will be limited.

# BACKGROUND

A. *Michael, Mindey, and Steven Inherit WDI and the Land it Occupies*

WDI is an adult entertainment business, a bookstore, located in Lennox, California. WDI originally was owned by Allan Morrison (Michael and Mindey's father, and Steven's grandfather), who also owned other adult bookstores. When Michael and Mindey's parents divorced, their mother, Geri Morrison Steingold, was awarded ownership of WDI and the land it occupies.

Geri died in July 1997, leaving behind her spouse, Joseph Steingold, her three children (Michael, Mindey, and Tracey Goverman), and her grandson, Steven, who was twelve years old. Geri's will provided that on the death of her husband, her estate would be divided equally among Michael, Mindey, and Steven.[3] Joseph died in 2000.

Michael was the executor of Geri's estate, the primary assets of which were WDI and the land it occupied. At the time, Michael lived in Atlanta and owned a chain of adult bookstores in the southeast United States. While the will was in probate, he came to Los Angeles every month or two to check on WDI; a long-time employee ran the day-to-day operations. During that time Michael, as executor, made certain capital improvements to the store, and purchased an additional parcel of land to increase the parking space.

In 1999, Mindey filed a petition in the probate court, asking for an order compelling Michael to account and to disclose financial information concerning WDI. Mindey (and their father, Allan) suspected that Michael was taking money out of the company. Michael subsequently filed his account and report, and Mindey filed objections to it. Sometime in 2001, Michael and Mindey entered into

---

[3] Steven's share was to be placed in a trust until he reached the age of 21.

a settlement agreement in which Mindey agreed to withdraw her objections and Michael agreed that Mindey would be entitled to actively participate in the management of WDI and would be appointed as co-director of the corporation after close of probate. When probate closed in December 2002, Mindey took over the management of WDI.[4]

B.    *WAM is Created*

Tax attorney Cris Wenthur, who was asked by the probate attorneys for Geri's estate to help clean up the corporation's records and provide a business structure for the estate assets, helped form an entity, WAM, to hold the real property that Michael, Mindey, and Steven inherited from Geri. The articles of organization for WAM were filed with the Secretary of State in August 2004, and the three members (Michael, Mindey, and Steven, through his trustee) entered into an operating agreement for WAM. Wenthur was told that the intent in forming WAM was to have WDI transfer profits, in the form of rental payments, to WAM for distribution to its three members. He understood that WDI would pay WAM "fair market rent beefed up" -- in other words, fair market rent plus 10 to 20 percent, because it was a family business -- which would save the family money in taxes. Wenthur's office prepared two different leases for WDI and WAM, one with an annual rent of $78,000 and the other with an annual rent of $96,000. Neither lease was signed by WDI or WAM.

---

[4]    There is some confusion as to when Mindey took over management of WDI. Michael testified that he ran WDI during the entire time Geri's estate was in probate, and that Mindey did not take over until close of probate. Mindey testified that she took control over WDI in January 2001. The exact time Mindey took over is not relevant to the issues on appeal.

C.    *Michael Sells His Shares in WDI*

At the same time that WAM was formed, Michael was a defendant in a tax evasion prosecution.  Michael and his attorney in that prosecution directed Wenthur to draft a stock repurchase agreement in which Michael agreed to sell his shares in WDI back to WDI in exchange for forgiveness of a $124,000 debt.  Although the agreement was drafted in August 2004, Michael and his attorney asked Wenthur to backdate the agreement to December 31, 2003 for reasons having to do with sentencing in his tax evasion case.

WDI began paying rent to WAM in late 2004 or early 2005.  Mindey, who was president of WDI and principal managing member of WAM, determined how much rent to pay each month, based upon what WDI's revenues were; the amount varied from month to month.  WAM then distributed that money to Mindey, Michael and Steven (or his trustee, before he turned 21 in June 2006).

D.    *Michael Agrees to Sell His Interest in WAM*

Michael was convicted of tax evasion in 2005 for underreporting his income from his adult bookstore companies by $1.4 million; he reported to prison in June 2005 and was released in February 2008.  While Michael was incarcerated, he (through an intermediary, Eric Claybough) and Mindey discussed having Mindey buy his interest in WAM.  In April 2007, they entered into a written agreement, drafted by Wenthur, entitled "Membership Interest Purchase Agreement" (MIPA).  Under the MIPA, which Claybough signed as "POA" (power of attorney), on behalf of Michael, Mindey agreed to purchase Michael's interest in WAM for $333,333.  The MIPA specified a closing date of April 24, 2007, although Mindey did not sign the document until April 25, 2007, the same date she signed a promissory note to Michael for the amount of $333,333 (which had a due date of August 1, 2007).  The promissory note included a "Method of Payment" provision,

which provided that payment may be satisfied in one of two ways: payment of the principal and interest, or return to Michael of his membership interest in WAM.

At the time Mindey entered into the agreement, she intended to get the funds to purchase Michael's interest by refinancing the property held by WAM, but the refinancing fell through. According to Mindey, she and Michael then entered into a oral agreement for Michael to sell his interest in WAM back to WAM in exchange for payments over time. Thereafter, Mindey and Steven believed that all distributions made to Michael (or his assignees) from WAM or WDI constituted payments under the oral agreement.

E.       *The Agreements Between Michael and Tradewind*

In December 2007, Michael entered into a written agreement with Tradewind, in which Michael purportedly sold his shares of "Wildcat Distributors, LLC" to Tradewind for $333,000. In conjunction with the agreement, Tradewind executed a promissory note to pay Michael $333,000 by providing Michael with a business expense account to be "used for development of Intopic Media, LLC projects." Several questions have been raised about this agreement. First, there was no such entity as Wildcat Distributors, LLC. Second, Tradewind was not created until 2009. Finally, there does not appear to be any actual consideration for Michael's purported interest because the purported agreement contemplated only the payment by Tradewind of business expenses incurred by Michael to promote and develop a business that would be owned by someone else, i.e., Jay Nault, the owner of Tradewind.

On December 31, 2008, Michael and Tradewind entered into another written agreement, after Steven told Michael that WAM's accountant, Rea Melanson, "had asked for something for the records indicating that Tradewind Consulting now owned a portion of WAM," if WAM was to send payments to Tradewind. The

6

agreement states that "[o]n this day Michael Morrison is transferring 100% of his interest in Wildcat Asset Management to Tradewind Consulting, LLC." There is no mention of consideration for the transfer.

The following day, Michael and Jay Nault (the owner of Tradewind) entered into a "consulting agreement." According to Michael, Nault signed the agreement on behalf of WAM, because Tradewind was a member of WAM by virtue of the transfer of his interest in WAM to Tradewind. The agreement provides that, effective January 1, 2009, the "Company" (presumably WAM) contracts for services of the "Consultant" (Michael) for the period of January 1, 2009 to July 31, 2009, with compensation at the rate of $6,000 per month. Michael testified that the services were information technology services, such as database restructuring or point of sale systems. Michael admitted, however, that WAM's only business is to own real property and collect rent.

F.  *Steven Discovers Mindey's Improper Charges on WDI's Credit Card*

In July 2008, Steven did not receive a distribution check from WAM. He went to the bookstore and, for the first time, examined WDI's financial records. He found questionable charges that Mindey had made on WDI's American Express card that appeared to be for personal items, beginning in 2003 or 2004.[5] He discussed the charges with Mindey and Michael, and determined the improper charges totaled $237,500.[6] Following negotiations, Mindey and Steven entered into a written agreement, which Mindey drafted, providing that Mindey would

---

[5]  There is some discrepancy regarding when the improper charges began; they may not have begun until 2005.

[6]  Michael testified that Mindey told him the amount of improper charges was $475,000. One-half of that amount is $237,500.

7

transfer her interest in WAM to Steven to satisfy her $237,500 note to Steven, and Steven would assume the roles of president of WDI and managing member of WAM and oversee the day-to-day operations. The agreement also provided that if the note is paid back on or before January 1, 2019, the interest that was given up by Mindey would be transferred back to her, but if it is not repaid Steven will continue to own it in perpetuity. Finally, the agreement stated that Mindey would continue to own her share (which was stated as "1/3 shareholder") of WDI and would continue to receive one-third of monthly distributions. Following execution of the agreement, Mindey received weekly or bi-weekly distributions from WDI, but did not receive any distributions from WAM.

G.    *The Monthly Distributions to Michael and/or Tradewind Decrease*

After Steven took over the day-to-day operations of WDI and WAM in 2009, the amount of the monthly distributions to Michael (or Tradewind) decreased. Steven explained that the economy was suffering at that time, and WDI's gross revenues and profits were decreasing. Nevertheless, Michael received significantly more than Steven in distributions because, as Steven explained, he was trying to pay down the amount owed to Michael for his interest in WAM. In August 2009, Steven started issuing checks from WDI, rather than WAM, to pay the distributions (to Tradewind) because Michael asked him to. Steven continued to issue checks from WDI to Tradewind until Tradewind stopped cashing the checks in early 2011, a few months after an exchange of angry text messages between Michael and Steven, during which Steven told Michael that he was going to lower the distributions.

8

H.    *Michael and Tradewind File Two Lawsuits*

Michael and Tradewind filed a lawsuit against Mindey, Steven, WDI, and WAM (the direct action) on June 1, 2011, and filed a derivative action on behalf of WDI and WAM the following day.  The operative first amended complaint in the direct action alleges that (1) Mindey formed WAM without Michael's knowledge or consent; (2) there was a failure of consideration with regard to the MIPA (to purchase Michael's interest in WAM), so Michael and Mindey agreed to treat it as a nullity, or in the alternative, the distributions he received after execution of the MIPA did not constitute payments under the agreement or were not sufficient payment of the amount owed; (3) Michael sold his interests in WDI and WAM to Tradewind; and (4) Mindey and Steven conspired to deprive Tradewind of its rightful ownership interest and share of distributions.  The complaint alleges causes of action for declaratory relief, breach of fiduciary duty, conversion, fraud by concealment, breach of oral agreement, money had and received, accounting, and breach of written contract.

The first cause of action for declaratory relief seeks a declaration that, among other things, Michael and Mindey agreed to treat the MIPA as a nullity (or, if the MIPA is found to be enforceable, that the distributions he received were not payments for his interest and that WAM is estopped to deny that he is a one-third owner), that Michael validly transferred his ownership interests in both WDI and WAM to Tradewind, and that Tradewind (or Michael, if his transfer is found to be invalid) is entitled to receive distributions from both entities equal to the distributions received by Mindey and Steven.

The second cause of action contains four counts of breach of fiduciary duty. The first count alleges that that Mindey and Steven breached their fiduciary duty by causing WDI and WAM to make distributions to themselves but not to Michael or Tradewind.  The second count is based upon allegations that Mindey skimmed

9

or stole approximately $500,000 from WDI, which deprived WDI and WAM of funds that would have been distributed to the shareholders of WDI and WAM. The third count is based upon the agreement between Mindey and Steven to transfer Mindey's share of WAM to Steven, which the complaint alleges deprived WDI and WAM of funds that would have been distributed to Tradewind. The fourth count alleges that Mindey and Steven used funds belonging to WDI and/or WAM to pay the expenses of their relatives unrelated to the companies' business, depriving the companies of funds that would have been distributed to Tradewind.

The third cause of action alleges two counts of conversion. The first count alleges that Mindey and Steven caused WDI and WAM to issue distributions to themselves while causing the companies to issue decreasing distributions to Tradewind. The second count is based upon Mindey and Steven's refusal to recognize Tradewind's ownership interests in WDI and WAM.

The fourth cause of action for fraud by concealment alleges that Mindey skimmed and stole approximately $500,000 from WDI and/or WAM and that Mindey and Steven tried to conceal their agreement to allow Mindey to keep $237,500 and allow Steven to receive $237,500 rather than return the stolen funds to WDI.

The fifth cause of action for breach of oral agreement alleges that Michael, Mindey, and Steven entered into an oral agreement for the purpose of closing probate, whereby Mindey would take over the day-to-day operations of WDI and would operate the business so as to maximize profits and distributions for the three shareholders. The complaint alleges that Mindey and Steven breached the agreement by failing to operate WDI and WAM in a manner reasonably calculated to maximize the distributions, and failing to issue equal distributions to Michael and Tradewind.

10

The sixth cause of action for money had and received alleges that Mindey and Steven caused WDI and WAM to fail to pay equal distributions to Michael and/or Tradewind while they caused the entities to pay distributions to themselves.

The seventh cause of action seeks an accounting of the receipts, expenses, books, and records of WDI and WAM for the years 2005 to the present.

The eighth cause of action for breach of written agreement against Mindey is based upon the promissory note Mindey signed in connection with the MIPA.

The derivative complaint is based upon the same allegations as the direct action. It alleges causes of action for conversion (two counts), breach of fiduciary duty (four counts), fraud by concealment, constructive fraud, money had and received, and accounting. The two counts of conversion are based upon allegations that Mindey skimmed and stole money from WDI, and allegations that Mindey and Steven used money from WDI and WAM for the personal benefit of their relatives. The breach of fiduciary duty counts are based upon (1) Mindey's alleged stealing, (2) the agreement between Mindey and Steven transferring Mindey's interest in WAM to Steven, (3) Mindey and Steven using funds from WDI and/or WAM to pay their relatives' personal expenses, and (4) allegations that Mindey and Steven have been paying employees in cash and under-reporting net revenues for the purpose of tax evasion, thus placing the entities in danger of legal penalties. The fraud by concealment, constructive fraud, and money had and received causes of action are based upon the agreement between Mindey and Steven to transfer Mindey's interest. The accounting cause of action seeks an accounting of the personal financial books and records of Mindey and Steven.

I.  *Mindey and Steven Refinance the WAM Property*

After the lawsuits were filed, Mindey and Steven decided to refinance the mortgage on the WAM property and take out funds to pay for attorneys. Mindey

11

arranged for the refinance, and took out $124,000. Steven deposited the entire amount into a WAM bank account, and took out $100,000. Although Mindey believed that they had agreed they would split the money to use for attorneys, Steven took the money exclusively for himself. According to Steven, the $100,000 was a capital distribution to him under the WAM operating agreement.

## J.  *Steven Files a Cross-Complaint*

Steven filed a cross-complaint on April 11, 2012. In the operative second amended cross-complaint, he alleges 13 causes of action against Michael, Mindey, and Tradewind. We need not discuss the allegations in detail, because no appeal was taken from the trial court's judgment in favor of the cross-defendants. We note, however, that the cross-complaint included a cause of action for declaratory relief in which Steven sought a declaration that Michael relinquished his interests in WDI and WAM.

## K.  *Trial*

On the first day of trial, counsel for plaintiffs announced that plaintiffs were withdrawing the derivative claims brought on behalf of WDI, and would not be challenging the authenticity of the stock repurchase agreement (by which Michael transferred his shares back to WDI). Until trial, Michael had maintained the position that he never knew of or signed that agreement; but based upon documents that were produced during discovery indicating that he did sign the agreement, he would concede the authenticity of the stock repurchase agreement, although he does not recall signing it.

The primary issues contested at trial related to (1) the distribution of profits from WDI; (2) Michael's alleged sale of his interest in WAM; (3) if there was such

a sale, how much is still owed as payment for that interest; and (4) if there was no sale, what is the fair market rent WDI should have been paying to WAM.

1. *Distribution of WDI's Profits*

Although Michael conceded at trial that he did enter into the stock repurchase agreement, he testified that he would not have sold his interest in WDI for only the forgiveness of a $124,000 debt because WDI had more than $1.5 million in gross receipts, with taxable income of almost $245,000 in 2002. Instead, he testified that at the time he signed the stock repurchase agreement, he, Mindey, and Steven entered into an oral agreement that WDI would pass through to WAM, as rent, all of WDI's revenues remaining after its bills were paid. He testified that he was shown a chart depicting the structure of WAM at the time WAM was created and the stock repurchase agreement was drafted, which indicated that a minimum of $18,000 per month was to be passed through from WDI to WAM.

Michael's testimony was contradicted by testimony from Mindey, Steven, and Wenthur, the attorney who drafted the chart. Although Mindey testified that when she was managing WDI and WAM she generally had WDI pay over to WAM all of its revenues after operating expenses were paid, she testified there was never an agreement – nor was one ever proposed – that required WDI to pass through to WAM all of its net profits. Steven similarly denied the existence of any such agreement. Wenthur testified that it was not his understanding from his discussions with Mindey that WDI would pass through to WAM all of its net revenues, but instead he understood that WDI would pay "fair market rent beefed up." He also testified that his office drafted proposed leases for WDI and WAM with annual rents of $78,000 (i.e., $6,500 per month) and $96,000 (i.e., $8,000 per month).

13

2. *Sale of Michael's Interest in WAM*

Michael testified that from time to time during his incarceration, he and Mindey had discussions (conducted through Claybough) about Mindey buying Michael's interest in WAM, but she could never obtain financing to do so. Based upon the estate's purchase of a parcel for parking a few years before, they believed the entire property was worth $1 million, so his one-third interest was worth $333,000.

Mindey testified that she and Michael reached an agreement for Michael to sell his interest, and Wenthur prepared the MIPA and a promissory note for her, leaving blank spaces to fill in the amounts and dates. Mindey testified that Michael told her that Claybough would sign the MIPA on his behalf, but Michael testified that he did not give Claybough a power of attorney to sign it. Michael also testified that he never had any discussions with Mindey about a promissory note. In any event, both Michael and Mindey testified that Mindey did not make the payment due under the MIPA on the closing date and she did not personally make any payments under the promissory note.

Although Michael took the position that the sale did not go through and the MIPA was a nullity, Mindey and Steven testified that Michael and Mindey entered into a subsequent oral agreement under which Michael sold his interest in WAM in exchange for payments over time. Michael denied there was any oral agreement, and introduced Schedule K-1 tax forms issued by WAM from 2004 to 2011 listing Michael (or Tradewind) as a one-third owner of WAM, as well as other documents that reference him as a one-third owner, to show that WAM continued to treat him (or Tradewind) as a co-owner. Steven testified that he referred to Michael as a one-third owner and had him included on the Schedule K-1's because Michael had

14

not yet been fully paid for his interest and therefore was holding title "on contingency."[7]

### 3. *Payment for Michael's Interest in WAM*

Steven presented evidence of the payments made to Michael and/or Tradewind for his interest in WAM. He included in his computation money paid to Michael from WDI after he sold back his interest in WDI (but before he purportedly entered into the agreement to sell back his interest in WAM), money paid to Tradewind by WDI at Michael's direction, and post-agreement money paid to either Michael or Tradewind by WAM. He determined that Michael (or Tradewind) has received almost all that is owed under the agreement. According to his calculations, there is $12,516 left to be paid. He admitted, however, that he sent an email to the accountant for WDI and WAM in November 2011 in which he stated that Michael was still owed around $60,000. He testified that he stopped having checks sent to Michael or Tradewind when they stopped cashing them, and he had not sent any checks after November 2011.[8]

### 4. *Fair Market Rent*

Both sides presented testimony from expert witnesses regarding what the fair market rent was for the building occupied by WDI. Plaintiffs' expert, a

---

[7]     This explanation is consistent with Steven's testimony regarding the agreement he had with Mindey regarding the transfer of her interest in WAM; he testified that he holds her interest until she finishes paying him the money she agreed to pay, and the Schedule K-1's for the years 2009 through 2011 did not include Mindey as a co-owner of WAM.

[8]     Michael contends that payments he received before he allegedly agreed to sell his interest in WAM cannot be included in the calculation of how much has been paid under the alleged agreement. He asserts that even if the court finds he entered into the agreement, he would be owed at least $135,500, plus interest.

15

commercial real estate salesman, opined that the fair market rent for the building in 2013 was $3 per square foot, gross rent (i.e., the landlord pays property taxes, maintenance, and insurance). Based on the square footage of the property found in public records, the rent would be $17,000 per month; if the rent were based on the square footage used by defendants' expert, the amount would be around $12,000 per month.

Defendants' expert, a real estate appraiser, measured the square footage of the building, and appraised the property for valuation as of August 1, 2004. He concluded the fair market rent would be $5,900 per month, triple net (i.e., the lessee pays real estate taxes, building insurance, and maintenance).

L.    *Statement of Decision*

Following the close of evidence and argument of counsel, the trial court issued a statement of decision. The court found that Michael and Tradewind failed to meet their burden on, or lacked standing to assert, the causes of action for breach of fiduciary duty, fraud by concealment, breach of oral agreement, and money had and received. With regard to the remaining claims for declaratory relief, accounting, conversion, and breach of promissory note, the court found "that the evidence overwhelmingly supports the conclusion that Michael comes before this court with unclean hands," and therefore the court "will not relieve plaintiffs from the consequences of their fraudulent scheme to hide their ownership interest in WDI and WAM as well as their receipt of income from these entities in order to defraud the government or other creditors."

1.    *Breach of Fiduciary Duty*

As to the breach of fiduciary duty cause of action, the court identified three claims that Michael and Tradewind asserted at trial: they asserted that Steven and

16

Mindey breached their fiduciary duty by (1) Mindey's theft of cash receipts and/or her misuse of WDI's credit card, and the ensuing cover-up by Mindey and Steven; (2) Steven's taking out a loan against the property owned by WAM and not sharing the proceeds equally with the other owners of WAM; and (3) Steven's failing to collect fair market rent from WDI on behalf of WAM.

With regard to the first claim, the court found there was no evidence that Mindey stole cash receipts. It also found that to the extent Mindey's misuse of WDI's credit card took place after Michael sold his interest in WDI, neither plaintiff has standing to complain about the conduct, and to the extent some of the improper charges took place before Michael sold his interest, Michael failed to establish the amount of his damages, if any. The court rejected plaintiffs' argument that Mindey's improper charges caused harm to WAM based upon Michael's assertion that there was an agreement that WDI would pass through all of its net revenues to WAM. The court found Michael's testimony regarding that alleged agreement to be "completely lacking in credibility."

With regard to the second claim, the court noted that the loan upon which plaintiffs based their claim was made after the lawsuits were filed. The court found that, by that time, Mindey had transferred her interest in WAM to Steven, and Steven believed that Michael had sold his interest in WAM back to WAM. Therefore, the court found that, under the circumstances, his failure to share the loan proceeds with either plaintiff did not violate his fiduciary duty to co-members.

The court rejected plaintiffs' third claim on two grounds. The court found that to the extent the claim is based upon Michael's testimony that the parties agreed that all of WDI's net profits would be passed through to WAM in the form of rent, with a minimum amount of $18,000, Michael's testimony was not credible. The court also found that Mindey and Steven always had determined the amount of rent WDI would pay based upon WDI's funds rather than an objective analysis of

17

what fair market rent should be, and plaintiffs never objected to that practice. The court concluded that plaintiffs "cannot now seek to impose an expert's evaluation of what would have been fair market rent on what was a family run business largely devoid of any formal business structure or practices."

The court concluded that "plaintiffs failed to carry their burden of proof to establish that either Mindey or Steven violated their fiduciary duty to WDI or WAM at any time."

### 2. *Fraud by Concealment*

The court noted that the fraud by concealment cause of action was based upon allegations that Mindey stole cash receipts from WDI and that Mindey and Steven entered into an agreement under which Steven received Mindey's interest in WAM in exchange for half of the debt owed to WDI. The court found that plaintiffs failed to produce any evidence that Mindey stole cash receipts, and to the extent the cause of action is based upon Mindey's misuse of WDI's credit card, plaintiffs have no standing to bring a claim because Michael sold his interest in WDI back to WDI.

### 3. *Breach of Oral Agreement and Money Had and Received*

The court noted that plaintiffs alleged that Michael, Mindey, and Steven entered into an oral agreement in 2000 in which they agreed that each would be one-third owners of WDI and each would receive one-third of any distributions from the business, and that Mindey and Steven breached the agreement and took more than their fair share of distributions by failing to pay plaintiffs the same amount they paid to themselves. The court found that plaintiffs had failed to carry their burden to show there were unequal distributions.

18

4. *Remaining Causes of Action*

In addressing the remaining causes of action, the trial court first noted that, to the extent plaintiffs alleged that Mindey and Steven converted money owed to plaintiffs by failing to make equal distributions, the court already had found that plaintiffs failed to carry their burden of proof on that issue. The court then detailed plaintiffs' remaining contentions: (1) Mindey and Steven converted Tradewind's ownership interest in WAM by taking the position that Michael sold his interest in WAM back to WAM under the MIPA, and therefore Michael had nothing to sell to Tradewind; (2) if the court finds the MIPA was effective to transfer Michael's interest in WAM, Mindey breached the promissory note executed in connection with the MIPA by failing to timely make the payments due and failing to pay interest; and (3) to the extent defendants presented evidence that the MIPA was modified, that evidence goes to a novation defense that defendants failed to plead in their answers. The court found that plaintiffs' arguments were moot because "the evidence overwhelmingly supports the conclusion that Michael comes before this court with unclean hands."

The court explained, "Michael seeks the court's help to save him from the consequences of the myriad agreements he entered into divesting himself of any interest in WDI and WAM and to instead find him to be an owner of one or both entities and entitled to damages for alleged breaches of fiduciary duty by his alleged co-members. But the court is satisfied that these agreements were prepared for an improper purpose and establish that Michael comes to this court with unclean hands." The court then pointed to the following evidence to corroborate its conclusion.

First, the court noted that the stock repurchase agreement was backdated at the request of Michael and his criminal defense attorney. The court observed that Michael had an obvious motive to create the appearance that he did not own any

19

assets and did not have a source of income from WDI, since he was facing sentencing in his tax evasion case, and Michael himself testified that it made no sense for him to sell his interest in WDI for only $124,000. The court also noted that despite entering into the stock repurchase agreement, Michael continued to receive distributions from WDI throughout 2004.

Next, the court pointed out that Michael initially denied entering into the stock repurchase agreement and claimed he had no knowledge of the WAM operating agreement and had not authorized the transfer of the real property to WAM. But then, faced with his signature on the documents and defendants' handwriting expert, Michael admitted signing and knowing about the documents. So, in order to make a claim to the income generated by WDI, Michael testified to an alleged oral agreement to pass through WDI's profits to WAM; he then testified that he had not entered into the MIPA, and had not authorized Claybough to sign the document, in order to claim he still owned an interest in WAM.

The court found further evidence that Michael was trying to hide his interest in WDI and/or WAM and to disguise his receipt of income from those entities in the various agreements involving Tradewind. The court pointed to Steven's testimony that Michael instructed him to make payments to Tradewind from WDI, rather than WAM, based on the consulting agreement between Michael and Tradewind. The court observed that this instruction made no sense because the alleged consulting agreement was between Michael, as consultant, and Tradewind, as a member of WAM.

Finally, the court stated that it was "convinced that Tradewind and its putative president Jay Nault are aiding and abetting Michael's fraudulent attempts to disguise his ownership in WAM and in fact, the entity Tradewind is a sham." The court noted it was clear from Nault's testimony that he knew nothing about WDI or WAM, he was unconcerned that Michael purported to sell Tradewind

20

shares in a business (WDI) he did not own, he did nothing to find out why distributions from WAM declined and then stopped altogether, and he testified that he had no intention of suing Michael related to the sales transactions.

### 5. *Estoppel*

In addition to finding that plaintiffs came to the court with unclean hands, the trial court also found that Michael was estopped from denying that he sold his interest in both WDI and WAM. The court based its estoppel finding on Steven's testimony that Michael confirmed he was selling his interest in WAM, and that Steven was making payments to Michael (or Tradewind) in excess of what would have been equal distributions in order to complete the payment as quickly as possible. The court noted that Steven also made payments from WDI to Tradewind on Michael's instruction, and understood from Michael's statements that Michael owned Tradewind, so those payments would also be going toward buying out Michael's interest in WAM.

### 6. *Derivative Claims*

We note that the trial court did not directly address the claims in the derivative lawsuit, except to state that "plaintiffs cannot maintain any of their causes of action against defendants either directly or derivatively." However, because the claims in the derivative action were based on the same allegations as the direct action, the findings the court made on the merits in the direct action also would apply to the causes of action alleged in the derivative action.

### 7. *Steven's Cross-Complaint*

Addressing Steven's cross-complaint, the court noted that his request for declaratory relief mirrored plaintiffs' claim, and "is mooted by the court's decision

21

set forth above."  As to his remaining claims, the court found that Steven failed to carry his burden of proof.

M.    *Judgment and Notice of Appeal*

The trial court entered judgment in favor of defendants and against plaintiffs on direct action, and in favor of cross-defendants and against Steven in his cross-complaint.  Michael and Tradewind timely filed a notice of appeal from the judgment.

**DISCUSSION**

On appeal, plaintiffs contend:  (1) the trial court improperly took judicial notice of her own personal knowledge as a former prosecutor as a basis for finding unclean hands; (2) the trial court failed to identify any evidence showing unclean hands by Michael related to the promissory note Mindey executed; (3) the trial court improperly applied the unclean hands doctrine to impose a forfeiture; (4) the trial court improperly applied the unclean hands doctrine to plaintiffs' claims for declaratory relief and breach of fiduciary duty; (5) the trial court failed to find that Mindey breached her payment obligation under the promissory note and that Michael was the prevailing party on the note; (6) the trial court failed to find that defendants were estopped from claiming that neither plaintiff is a member of WAM; (7) the trial court failed to find that Steven breached his fiduciary duty by failing to make equal distributions; (8) the trial court failed to find that either Michael or Tradewind is a one-third owner of WAM with standing to bring derivative claims; and (9) the trial court failed to find that Steven breached his fiduciary duty by failing to charge and collect from WDI fair market rent.

A.  *The Unclean Hands Doctrine Does Not Apply*

Plaintiffs' first four contentions involve the trial court's application of the unclean hands doctrine. We need not address those contentions individually because we conclude the unclean hands doctrine does not apply under the circumstances of this case.

The unclean hands doctrine arises from "the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim . . . is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' [Citation.] Thus while 'equity does not demand that its suitors shall have led blameless lives,' [citation] as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. [Citations.]" (*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.* (1945) 324 U.S. 806, 814-815.)

While the record in this case supports the trial court's conclusion that Michael and Tradewind engaged in deceitful, and possibly fraudulent, conduct, the unclean hands doctrine does not apply in this case because the deceitful conduct at issue was directed at hiding Michael's assets or sources of income from others, and was not directed at defendants.[9] The California Supreme Court long ago explained

---

[9]  We disagree with plaintiffs' assertion that the trial court engaged in speculation, based upon the judge's prior experience as a federal prosecutor, in concluding that Michael engaged in the various transactions at issue to hide his assets and/or sources of income. It does not take a former prosecutor to recognize that there is no other rational explanation for those questionable transactions (such as selling an interest in a business

23

that "[i]t is not every wrongful act, nor even every fraud, which prevents a suitor in equity from obtaining relief. His misconduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief. It must have been conduct which, if permitted, inequitably affects the relationship between the plaintiff and the defendant." (*Bradley Co. v. Bradley* (1913) 165 Cal. 237, 242; accord, *Estate of Blanco* (1978) 86 Cal.App.3d 826, 833.) As we observed in *Estate of Blanco*, "[t]he essence of the 'clean hands' doctrine is not that the plaintiff's hands are dirty but 'that the manner of dirtying renders inequitable the assertion of such rights against the defendant.'" (*Estate of Blanco*, *supra*, 86 Cal.App.3d at p. 834.)

In this case, Michael's and Tradewind's deceitful conduct in attempting to hide Michael's assets and/or source of income from others did not inequitably affect the relationship between plaintiffs and defendants. In fact, defendants were aware of Michael's goal and were in many ways complicit in the deceit. Therefore, the trial court erred in applying the unclean hands doctrine to deny relief to Michael and Tradewind.

Our conclusion that the unclean hands doctrine does not apply does not, as plaintiffs suggest, require reversal of the entire judgment and remand for entry of a judgment in plaintiffs' favor or retrial. First, the trial court did not rely upon the unclean hands doctrine to deny recovery to plaintiffs on all of their claims; the court ruled against them on the merits, or found they had no standing, as to several of their claims, and plaintiffs did not challenge most of those rulings in their appellants' opening brief. But more importantly, the trial court expressly identified in its statement of decision the issues it was not deciding on the merits due to

---

making more than $1.5 million in gross receipts annually, with taxable income of almost $245,000 per year, for a mere $124,000).

plaintiffs' unclean hands: (1) whether Mindey and Steven converted Tradewind's ownership interest in WAM by taking the position that Michael sold his interest in WAM back to WAM under the MIPA, and therefore Michael had nothing to sell to Tradewind; (2) whether, if the court finds the MIPA was effective to transfer Michael's interest in WAM, Mindey breached the promissory note executed in connection with the MIPA by failing to timely make the payments due and failing to pay interest; and (3) whether defendants' evidence that the MIPA was modified goes to a novation defense that defendants failed to plead in their answers. Therefore, we will reverse the judgment only as to those identified issues, and the claims to which they relate, and remand the matter to allow the trial court to decide those issues and claims in the first instance, based upon the trial record.

## B.   *Plaintiffs' Remaining Contentions*

Plaintiffs' remaining contentions assert the trial court failed to find: that Mindey breached the promissory note and that Michael is entitled to attorney fees, that defendants were estopped from claiming that neither plaintiff is a member of WAM, that Steven breached his fiduciary duty by failing to make equal distributions and failing to collect market rent from WDI, and that plaintiffs had standing to bring derivative claims. Some of those contentions are moot in light of our partial reversal and remand, and the remainder have no merit.

### 1.   *Alleged Breach of Promissory Note*

Plaintiffs contend that the trial court erred by failing to find that Mindey breached the promissory note she executed in connection with the MIPA and that Michael is entitled to judgment in his favor and attorney fees under the note, because his testimony that Mindey made no payments on the note was not contradicted. As we noted, the trial court expressly declined

25

to decide whether Mindey breached the promissory note, because it found Michael had unclean hands. Accordingly, we have concluded that the trial court must decide on remand whether the promissory note is enforceable and, if so, whether it was breached.

2. *Estoppel*

Plaintiffs contend the trial court erred in failing to find defendants are estopped from denying that either Michael or Tradewind is a one-third owner of WAM in light of the Schedule K-1 tax forms listing one or the other as co-owner and undisputed evidence that Michael has not been fully paid for his share of WAM. It appears, however, that the trial court impliedly found against plaintiffs on this issue, because the court expressly found that "Michael is estopped from denying that he sold his interest in both WDI and WAM," based on Steven's testimony that Michael confirmed that he was selling his interest in WAM and that Steven made payments to Michael (from WAM and, at Michael's direction, from WDI) beyond what would have been equal distributions in order to pay off what was owed to Michael. Plaintiffs have not challenged that estoppel ruling in their appellants' opening brief, and therefore the issue is forfeited. (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764-765.)

In any event, the trial court's finding that Michael confirmed that he was selling his interest in WAM -- and the court's finding that Michael's testimony to the contrary was not credible -- precludes a finding of estoppel against defendants, because Michael cannot establish that he was ignorant of the fact that he had sold his interest in WAM. (*Estate of Bonanno* (2008) 165 Cal.App.4th 7, 22 [""'four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel

had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."'"'"].)

We note, however, that the trial court left unresolved what amount is still owed to Michael for the sale of his interest. Accordingly, the court must make that determination on remand.

3.      *Alleged Breach of Fiduciary Duty*

Plaintiffs contend the trial court committed an error of law by adding a willfulness or scienter element to their claim that Steven breached his fiduciary duty by failing to make equal distributions. Their contention is premised upon the trial court's use of the phrase "under the circumstances" when it found there was no breach when Steven did not share equally the proceeds from the loan that was taken out against the property owned by WAM. The court stated that at the time the loan was taken out, "Mindey had transferred her interest in WAM to Steven and based on Mindey's and Michael's own statements, Steven believed that Michael had sold his interest in WAM back to WAM. Under these circumstances, when the membership of WAM is in dispute through no fault of Steven, his failure to share the proceeds of the loan with either plaintiff cannot be seen as a violation of his fiduciary duty to his co-members." It appears that, rather than adding a "willfulness" element to the tort as plaintiffs contend, the trial court simply found that plaintiffs were estopped to assert a breach of fiduciary duty for failure to distribute the proceeds of the loan, given the court's finding that Michael was estopped to deny that he sold his interest in WAM back to WAM. We find no error with regard to that ruling.

Plaintiffs also misapprehend the trial court's ruling with regard to plaintiffs' claim of breach of fiduciary duty based upon Steven's alleged failure to collect fair market rent from WDI to be paid to WAM. Plaintiffs argue "[t]he trial court

27

committed an error of law in characterizing WAM as a 'family run business' such that, 'under the circumstances,' [Steven's] self-dealing (charging less than fair market rent to his own company . . . ) was somehow not a breach of his fiduciary duties. [¶] A fiduciary duty does not exist on a subjective sliding scale that changes 'under the circumstances' if it arises in the context of a family business." Once again, it appears that, rather than applying a "subjective sliding scale," the trial court simply found that plaintiffs were estopped to claim that Steven was required to charge fair market rent to WDI because plaintiffs were aware that Steven (and Mindey before him) had never charged fair market rent, and plaintiffs never objected to that practice. As before, we find no error.

4.      *Standing to Assert Derivative Claims*

Plaintiffs argue that even under defendants' theory that Michael orally agreed to sell his interest in WAM back to WAM, it is undisputed that Michael (or Tradewind) have not been fully paid under that agreement, and therefore the trial court erred by ruling that neither plaintiff had standing to bring derivative claims on behalf of WAM. In making this argument, plaintiffs ignore the bases for the claims alleged in their derivative action and the trial court's rulings on the merits of the breach of fiduciary duty and fraud by concealment claims alleged in the direct action.

The causes of action alleged in the derivative complaint are based upon allegations that: (1) Mindey skimmed and stole money from WDI; (2) Mindey and Steven used money from WAM for the personal benefit of their relatives; (3) Mindey and Steven breached their fiduciary duties and committed fraud by entering into an agreement to transfer Mindey's interest in WAM to Steven; and (4) Mindey and Steven have been paying employees in cash and under-reporting net revenues for the purpose of tax evasion, thus placing the entities in danger of

28

legal penalties.  In ruling on the causes of action in the direct action, the trial court made findings that (1) plaintiffs did not present any evidence that Mindey skimmed money from WDI; (2) Mindey's misuse of WDI's credit card did not harm WAM; and (3) the agreement between Mindey and Steven did not cause harm to WAM.  On our review of the record of the trial, we find that plaintiffs presented no evidence that Mindey or Steven used money from WAM for the personal benefit of their relatives, or that Mindey or Steven paid WAM employees in cash or under-reported net revenues -- in fact, there was no evidence that WAM had any employees or revenues other than rental payments from WDI.[10]

As these findings and lack of evidence show, regardless of whether plaintiffs had standing to bring derivative claims on behalf of WAM, those claims failed on the merits.

---

[10] Although there was evidence that WDI had employees, plaintiffs dismissed their derivative claims brought on behalf of WDI.

## DISPOSITION

The judgment as to the breach of fiduciary duty, fraud by concealment, breach of oral agreement, and money had and received causes of action in plaintiffs' direct action, and all of the causes of action in plaintiffs' derivative action is affirmed.  The judgment as to the declaratory relief, accounting, conversion, and breach of promissory note causes of action in the direct action is reversed and remanded with directions to the trial court to decide those causes of action on the merits.  The trial court also is directed to determine the amount, if any, still owed to Michael Morrison and/or Tradewind Consulting, LLC for the one-third interest in Wildcat Asset Management, LLC.  The parties shall bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.



We concur:




EPSTEIN, P. J.




COLLINS, J.


30